# Consumer Safety Associates, LLC

4501 N.W. 25th Way
Boca Raton, Florida 33434

(561) 241-1900

Wm. F. Kitzes, J.D.
Board Certified
Product Safety Manager
_____

Safety Analysis
Warnings
Expert Testimony

Safety Management
www.productsafety.com
kitzes@productsafety.com
_____

FAX:
(561) 241-1903

June 11, 2009

Peter M. Williamson, Esquire
Williamson & Krauss
21800 Oxnard Street, Suite 305
Woodland Hills, CA 91367

Re: Rosa v. TASER

Dear Mr. Williamson,

The following report is preliminary and based on information available to date. The issues described below are subject to change as additional information becomes available.

Product safety management is a system that a reasonably prudent manufacturer puts in place before the first product is manufactured to ensure that the final product, along with its warnings, packaging and marketing materials, is reasonably safe. It starts with a statement of commitment for product safety from top management and develops a company's procedures to identify hazards, assess the risk, apply adequate safety measures to eliminate hazards from the design, places a guard between users and potential injury and to warn users of all hazards that have not been eliminated or adequately guarded through technically feasible and economically practical safety measures.

To ensure that product safety management programs are in place, a product safety audit as outlined by the National Safety Council can be used to test the validity of the company's program and to identify the objective techniques to be

Washington D.C. Research Services
CPSC • NHTSA • OSHA • FDA



EXHIBIT
51

applied. Once established, ensuring that the required elements are incorporated in the plan is generally not prone to error. Although the application of documents and data may be subject to discussion, the actual principles are well established in the literature.

Product safety management theory has been published and reviewed by scholars in the field for over 50 years. As can be shown from the wide dissemination and acceptance by academia, business and legal professionals, these concepts are widely used and accepted throughout the safety community.

Safety management is primarily a tool to protect the public before products are offered for sale. When used correctly, these principles are a reasonable model for injury prevention. It is only after an injury that they are applied to determine if the managers failed to apply the accepted principles.

When evaluating product safety, it is incumbent upon a reasonably prudent manufacturer, distributor, and retailer to apply the following accepted principles of safety analysis to insure that the products are reasonably safe.

1.  Establish and observe a written safety policy. This policy should emphasize commitment to safety. In writing, it will insure all employees obtain clear guidance on safety issues. The policy should set forth a method for discussing safety responsibilities.

2.  Adequately identify and evaluate product hazards. A hazard is the inherent capability of a product to do harm. Manufacturers, distributors, and retailers must review the potential injury-causing energy and evaluate severity and foreseeability.

3.  Perform an adequate design review integrating product hazards, the environment, and foreseeable consumer use. Once hazards are identified, the reasonably prudent manufacturer/distributor/retailer must consider the conditions of use under which the injury-causing mechanism (hazard) can cause harm to the user.

Analysis of the environment where the product will foreseeably be used, especially in light of product promotion, is critical in discerning how the consumer may foreseeably use the product, even if it is not the use intended by the manufacturer.

The product must be reasonably safe prior to distribution in commerce. If it is not possible to eliminate the hazard, the reasonably prudent manufacturer, distributor, and retailer must take steps to guard against the hazard, to adequately inform users of the danger inherent in the product, and to motivate them to avoid that danger.

4.     <u>Monitor the safety performance of the product after sale and use, and take corrective action where necessary</u>.  Once products are distributed to consumers, a responsible manufacturer/distributor/retailer must determine where injuries can occur, or if a product defect (including lack of adequate labeling and safety information) could create injuries.  Where corrective action is needed to substantially reduce or eliminate injuries, consumer notification and additional corrective measures must be implemented to insure consumer safety.

5.     <u>Develop adequate warnings and training to motivate consumers to understand and avoid dangers</u>.  This is critical and relatively inexpensive.  When consumers have sufficient data to make an informed decision about safety, they are in a better position to address safety issues.

*     *     *     *     *

A key precept of safety management concerns products with inherent capability to do catastrophic harm.  In priority order, the duty of a reasonably prudent manufacturer is to <u>eliminate the hazard</u>, or, if this is not possible while preserving utility, <u>guard against the hazard</u>.  At a minimum, the manufacturer must properly <u>inform users of the danger inherent</u> in the product and motivate them to avoid injury.

The first concept is the safety engineering hierarchy of priorities:

•     Eliminate hazards

•     When hazards cannot be eliminated, provide feasible safeguards against them

3

- Provide warnings and personal protective equipment against remaining hazards

> National Safety Council
> Product Safety Management Guidelines, 1989

\*     \*     \*     \*     \*

In 1931, H. W. Heinrich, Assistant Superintendent for the Engineering and Inspection Division of the Travelers Insurance Company published the primary modern text of Safety Management, *Industrial Accident Prevention, A Scientific Approach*. The results of his in-depth analysis of more than 5000 accidents revealed four fundamental principles of scientific accident prevention:

1.     Executive interest and support
2.     Cause-analysis
3.     Selection and application of remedy
4.     Executive enforcement of corrective practice

These concepts, developed by Heinrich for the Joliet Steel Works, have evolved into modern day safety management practices. Scholarly research has further developed the foundation for safety management practices.

The Consumer Product Safety Commission incorporated these principles in its 1975 publication, *Handbook and Standard for Manufacturing Safer Consumer Products*. The Commission addressed executive action, design review, distribution and corrective action.

In 1983, Harold Roland of the University of Southern California Institute of Safety and Systems Management and Brian Moriarty authored *System Safety Engineering and Management*, outlining the need for product safety policy and analysis to prevent injuries. They evaluated hazard identification, severity and a systematic approach to identify defects.

The National Safety Council first published *Product Safety Management Guidelines* in 1989 describing the relationship between marketing, manufacturing, and safety communications as a key to corporate accident prevention. Their analysis includes the hierarchy of safety management and prevention programs to substantially reduce or eliminate injuries.

Over the past 20 years, I have published articles and book chapters outlining the principles of safety analysis and product safety management, lectured at the National Safety Council on injury prevention and warnings, and have assisted major manufacturers, distributors and retailers on safety management issues and recalls. I have developed warnings and safety materials for major manufacturers, and have taught safety management to corporate representatives, government officials and attorneys across the country.

\*     \*     \*     \*     \*

On August 29, 2004, Michael Robert Rosa was walking on Carlton Drive in Del Ray Oaks, California, when he was confronted by police in the roadway and took off running. Mr. Rosa appeared confused and failed to stop. According to the Monterey County District Attorney, Mr. Rosa was pursued by police officers who believed he ingested a "central nervous system" stimulant, later identified as d-methamphetamine. Mr. Rosa was hit with multiple shocks from a Taser ECD in both the dart and drive stun mode. He later died of ventricular arrhythmia. Dr. Hain cited the "effects of the Taser application and arrest by police very likely contributed to his death."

In analyzing the effects of TASER shocks to a suspect under the influence of methamphetamine in general, and on Michael Rosa in specific, information obtained from a review by Barry Gustin, M.D., MPH, provides a basis for evaluation of the adequacy of warnings provided by TASER to police agencies.

1.    Michael Rosa received at least 10 TASER shocks, and perhaps 12

2.    After cuffing, Rosa was rolled on his back and noted
      to be unresponsive

3.  Paramedics found him in ventricular fibrillation and administered defibrillation

4.  Dr. Hain, the forensic pathologist, found Rosa died of ventricular arrhythmia, in an agitated delirious state caused by acute methamphetamine intoxication. The added stress and/or physiologic effects of TASER application and arrest very likely contributed to his death.

5.  Agitation, increased muscular activity and hyperthermia often can result in lactic metabolic acidosis, which can lead to cardiac dysrhythmia and death. It can lower the threshold for ventricular fibrillation.

6.  Electrical effects of TASER can increase metabolic acidosis due to sustained involuntary muscle contraction.

7.  People presenting as ambulatory and energized like Rosa generally do not die from the effects of methamphetamine alone. Death is quite rare without associated factors such as physical restraint or TASER shock.

8.  Literature has linked in-custody deaths of suspects under the influence of a stimulant drug who have been recently TASERed.

9.  TASER applications followed by prone restraint impair breathing.

10. It is more probable than not that Michael Rosa would not have arrested without the multiple TASER exposures. He died as a direct consequence of the multiple TASER cycles.


Based on information available to date, and subject to review as additional information is provided, it is my opinion that:


1.  TASER International failed to apply the accepted principles of safety analysis to adequately develop training materials for Police Academies and warn officers of the risk of serious injury or death associated with foreseeable use of the TASER. TASER International failed to adequately:

a)  Establish and observe a written corporate safety policy

b)  Identify product hazards and evaluate severity

6

c)    Perform a risk assessment to adequately integrate product
      hazards, the environment and foreseeable consumer use

d)    Monitor the safety performance of their product

e)    Take adequate corrective actions to warn police agencies of the danger
      and instruct officers to avoid injury to suspects.

2.    TASER International failed to adequately warn and train Police
Departments and police officers of the potential for catastrophic injury or death to
suspects from multiple or prolonged TASER shocks.

3.    In light of TASER's continuing claims of safety for suspects during and
after multiple and prolonged TASER shocks, TASER failed to adequately evaluate the
risk of injury to "suspects" from such continuous application from the TASER electrical
discharge into police suspects.

4.    TASER failed to adequately test and confirm the effects of multiple and
prolonged application while their training materials permitted virtually unlimited shocks
to take down suspects, including those under the influence of drugs or alcohol.

5.    . TASER failed to maintain an accurate record keeping system and adequate
database to support claims of safety.

*       *       *       *       *

Excerpts from the deposition or Rick Smith, President and CEO of TASER
International, are instructive.

page

40    Holding down the trigger of an M26 will continuously discharge an
      electrical shock for 6 to 10 minutes

53    TASER does not require police agencies to participate in training
      to purchase an M26

82    Original TASER exposure research in 1996 and 2002 conducted on
      animals, specifically pigs

7

89   TASER did not test for changes in pH levels before marketing the M26

111  Primary risks include that of falling and strong muscle contractions,
     similar to athletic exertion

129  Don't think there is any documentation to support impaired breathing

171  Agree with findings of Department of Defense
     Human Effects Center of Excellence (HECOE) Study

206  Field experience indicates that one or a small number (5 or 6) of activations
     are present in most instances

220  Before marketing the M26 in 1999, there was no direct investigation
     of acidosis from muscle contractions much greater than 5 seconds
     It was not an area of concern


       Documentation available since the 1999 introduction of the ADVANCED
TASER M26 provide notice to TASER International of the potential risks associated
with the foreseeable use of TASERs.  TASER failed to adequately investigate those
risks, and they failed to adequately warn or train police agencies and officers of the
potential unreasonably dangerous conditions associated with multiple applications of
the M26 and other TASER products.  TASER International appears to ignore the data
concerning dangers to TASERed suspects, particularly those under the influence of
drugs, but they affirmatively promoted use of the TASER to bring down such suspects
in spite of the risk of serious injury or death.


       On July 29, 1999, Department of Justice published the HEAP Sticky
Shocker Assessment.  The analysis addressed both metabolic and respiratory acidosis
resulting from "electrical insult" introduced by both the TASER and Sticky Shocker,
and stated that Death following TASER use may be due to acidosis.  Their research pre-
dates the death of Michael Robert Rosa by 5 years, and provides early notice to TASER
of the potential for multiple and prolonged TASER shocks to be associated with fatal
acidosis.


       The ADVANCED TASER - Less Lethal EMD Weapon Medical Safety
Information was published by TASER in 2000.  The introduction by Rick Smith states:

> The system must be sufficiently safe that the risk of injury or
> death should be less than that for current less-lethal
> technologies such as impact munitions (bean bags, rubber
> bullets, etc.)

He goes on to compare TASER's testing program to the pharmaceutical and medical
device industries. The testing required by FDA to ensure that a product is safe (has no
unreasonable side effects) and effective. Yet, by Mr. Smith's own admission, no testing
was done to ensure the safety of multiple, continuous or prolonged applications, even
though TASER does not limit the number or duration of applications. Mr. Smith is
aware that upwards of 6 continuous 5 second shocks are typical and acceptable in field
use. Further, statistics published by TASER state that 27% of persons who die in police
custody without trauma suffered exposure to TASER electrical shock, while the same
was true for only 11% of suspects subject to chemical spray and only 8% to impact
weapons.

In 2000, TASER posted a Demonstration of their "most advanced
TASER," the M18L, a slightly less powerful but substantially similar consumer version
of the ADVANCED TASER M26. When describing the effects of the 50,000 volt
charge, they state that "The rapid work cycle instantly depletes the attacker's blood
sugar level by converting it into lactic acid." According to Dr. Gustin, adding lactic acid
to the system lowers the pH, which in addition to exertion in a restricted position is
associated with cardiac arrest.

As stated by Rick Smith, much of TASER's research on the cardiac effects
of TASER application has centered on animal studies. Yet the owner's manual for the
M18L appears to be at odds with the importance of those studies. Available on the
TASER store website, the manual on page 14 states:

> **EFFECTS ON ANIMALS**
> The nervous systems of animals differ greatly from human
> beings. The TASER®M18/M18L is designed to be effective
> on a human subject. Accordingly, it will not be as effective
> at incapacitating an animal as it is on a human being. The
> ADVANCED TASER® M18/M18L should not be used as
> sole protection from wild, uncontrollable, or attacking
> animals.

9

In the September 1, 2001 issue of the <u>Lancet,</u> a highly regarded British medical journal, researchers found that the TASER's injury threshold needed to be studied, as well as the effects of TASERs on the nerves. Methods to identify people at risk for respiratory or cardiac arrest need to be examined as the TASER itself may affect acid base balance. The mechanism of injury by TASERs should be compared with those of physical and chemical restraints to insure the safest methods are used.

In the <u>2002 TASER Tactics Conference</u> in Las Vegas, Medical Testing of the ADVANCED TASER for Acidosis Effects was discussed. TASER clearly was aware of the risk of injury or death and did not share the knowledge with the police agencies during training.

On June 2, 2003, <u>Version X</u> of the TASER Training Program was published. It states that:

- TASER shock might cause slight burn or cause muscle contractions

- Officers can fire the M26 more than 10 <u>back to back</u> 5 second cycles in the field

- The TASER is safe and effective for suspects under the influence of drugs or alcohol

According to the <u>Report of the Monterey County District Attorney,</u> Officer Doza was trained by TASER International about 6 months after the publication of the <u>Version 11.0 Certification Lesson Plan (January 2004)</u>. The plan states that:

- TASER causes muscle contractions that may result in athletic exertion type injuries

- 99% incapacitation in less than a second with no long term effects

- Holding the trigger continuously will continue electrical discharge until released

- The 10 <u>back to back</u> 5 second cycle limit to protect
  weapons  in training does not apply to field use

- 95% success rate with "meth" influenced suspects

- Designed to stop the most hardened, drug induced
  suspects

On August 29, 2004, Michael Robert Rosa was pronounced dead after
being taken into custody.  He suffered multiple shocks by police using an ADVANCED
TASER M26.  At the time of is death, TASER International provided no warnings or
training to police agencies concerning the danger of multiple exposures and repeated,
continuing electrical shocks to suspects.

In his deposition, Rick Smith states that TASER participated in the data
gathering for the Department of Defense <u>The Joint Non-Lethal Weapons Human Effects
Center of Excellence (HECOE) Study</u> and that generally speaking, he agrees with their
findings.  Yet,  Part II Appendices to that Study dated March 1, 2005, was critical of the
TASER International Database:

- Records not collected in a statistically representative survey

- Records potentially influenced by a number of sources of bias

- Known to be censored

- Not clear that TASER International verifies the reports

- The TASER International data are messy

- Data  that are not internally consistent

- Therefore it is difficult to rely on the data to draw definitive
  conclusions about the incidents.

The deposition of Stephen Tuttle, TASER Director of Communications and
Risk Management, in <u>Lee v. TASER</u> (September 17, 2008) highlights the inconsistencies
in the TASER data and indicates why the database does not provide sufficient insight
into multiple and prolonged use in the field.

On pages 37 and 38 of the deposition, Mr. Tuttle claims that he can't determine how many of the 600,000 to 700,000 TASER uses were multiple exposures. Yet on the TASER's website as viewed on March 7, 2008, in the section "Law Enforcement FAQ's," the answer to question Number 5, What is TASER International's stance on multiple TASER ECDs application

> When used properly . . . There have been thousands of documented cases in which multiple applications from the TASER system were not only appropriate but were absolutely critical to a safe outcome of the situation.

This seems to contradict Mr. Tuttle's assertion.

While Mr. Tuttle claims that he has the largest statistical library on use and deployment of TASERs, he admits he does not know how to maintain the safety of TASERs used in the field. All he is trying to do is "grab statistics" where he can get them. He states "It's a risk management issue." Finally he states he does not have all the statistics, he's just providing all he can get his hands on. His statistics do not cover in-custody deaths.

In effect, TASER and Mr. Tuttle have no statistical database at all. They have only anecdotal reports of TASER deployments and can't reach any statistical conclusions based on test data. They can only state they have collected data. Such shortcomings in the data are confirmed by the Appendices (Part II) of the HECOE Study.

The TASER website contains an article and slide presentations comparing the safety of TASER electrical discharge to crossing a street, swimming, and playing basketball. Such comparisons are both meaningless and misleading.

Mr. Smith admits that TASER did not test for changes in pH levels before marketing the M26. Yet, as early as 2002, TASER's own conference states awareness of the dangers surrounding metabolic acidosis. Dr. Gustin's report makes clear that straight forward biomedical analysis would have provided a basis for understanding such changes in lactate levels, coupled with restraint impaired breathing and its effect on suspects under the influence of stimulants.

As stated earlier, Mr. Smith contends that the effects of strong muscle contractions are no more dangerous than athletic exertion. He states that TASER performed no direct investigation of metabolic acidosis resulting from muscle contractions induced by TASER applications greater than 5 seconds because it was not an area of concern. Yet he concurrently states that there is no limit to the number of electric shocks which can be administered even to a "hardened" drug user. He understands that as many as 5 or 6 TASER applied 5 second cycles are a foreseeable and acceptable encounter.

Dr. Gustin states in his report that it is quite rare for a suspect under the influence of stimulants such as methamphetamine to die without associated factors such as physical restraint or TASER application. He notes that, in fact, the medical literature has linked in-custody deaths to suspects under the influence of stimulant drugs and such associated factors.

Dr. Gustin further states, to a reasonable degree of scientific certainty, that Mr. Rosa would not have died absent the multiple TASER exposures. Clearly, TASER failed to warn police agencies of the fatal risks associated with TASER exposure to suspects under the influence of stimulant drugs. In fact, they encouraged such use.

Finally, TASER appears to base much of these claims of the safety of the device upon their database, showing 95% success rate with "meth" influenced suspects and 99% incapacitation of suspects in less than 1 second with no long term effects. That is what they tell police officers before they go into the field. Yet the data does not appear to support their claims.

If 99% incapacitation in less than 1 second is correct, then Mr. Smith's admission that in many instances upward of 5 - 6 cycles of TASER electrical shock is required to "incapacitate" a suspect and that TASER prescribes no limit to the number or duration of electrical shock that an officer can deliver. If there is a 95% success rate with "meth" suspects, what happens to the other 5%? Do they evade capture? Do they suffer the fate of Mr. Rosa as described by Dr. Gustin where associated factors lead to in-custody death?

Version 11 of the TASER Certification Training, in effect at the time Officer Doza was to be educated about the risks of TASERs to suspects, states that muscle contraction caused by TASERs can result in "athletic type injuries." Rick Smith's deposition agrees. Does this imply that such injuries are limited to temporary muscle aches and pains, or do they describe the potential for metabolic acidosis and cardiac arrest identified in Dr. Gustin's report?

TASER clearly failed to adequately investigate the risk of severe injury or death associated with the multiple, continuous and prolonged use of TASERs in combination with police field restraint practices, especially on suspects with drug induced excitations.

*Wm F Kitzes*

June 11, 2009

I have reviewed the following materials for this report:

Monterey County Office of the District Attorney Letter of December 7, 2004, from Edward Hazel to Police Chiefs Ron Langford and Anthony Sollecito, Subject: Officer involved in fatal incident of Michael Robert Rosa

Review of Michael Rosa Matter by Barry Gustin, MD, MPH, Draft, June 3, 2009

Deposition of Patrick Smith in Heston and Rosa

Deposition of Stephen Tuttle in Lee v. TASER

"Effects of stun guns and tasers," The Lancet, Vol 358, September 1, 2001

HEAP Sticky Shocker Assessment, Department of Justice, July 29, 1999

ADVANCED TASER M26 Less-Lethal EMD Weapon Medical Safety Information, 2000

2002 TASER Tactics Conference, Monte Carlo Hotel, Las Vegas, May 17-19, 2002

TASER Certification Lesson Plan Version X, TASER X26, ADVANCED TASER M26

TASER Certification Lesson Plan Version X.1, TASER X26, ADVANCED TASER M26

TASER Instructor Certification Lesson Plan and Support Material Version 11.0, January 2004, TASER X26 and ADVANCED TASER M26

TASER Instructor Certification Course, TASER X26 and TASER M26 Non-Lethal Weapons, Version 12.0 Released November 2004

TASER International Training Bulletin 12.0-04, June 28, 2005

Department of Defense The Joint Non-Lethal Weapons Human Effects Center of Excellence (HECOE) Study, Part II--Appendices, March 1, 2005

TASER Product Warnings--Law Enforcement, March 1, 2007

TASER Product Warnings:  Law Enforcement, April 28, 2008

TASER Metabolic Acidosis--Detail, April 24, 2008

Training Bulletin 14.0-03 TASER Law Enforcement Warnings, Release date:  4/28/08

TASER Website:  FAQ

TASER Website:  Bemidji Police Department

TASER Website:  TASER ECD Distribution

TASER Website:  TASER Demonstration

ADVANCED TASER M18/M18L Operating Manual

Wm F. Kitzes has over 30 years of research and experience at the U.S. Consumer Product Safety Commission, the Institute for Safety Analysis and Consumer Safety Associates, where he currently serves as Principal Safety Analyst and Product Safety Manager. Mr. Kitzes is a Board Certified Product Safety Manager and Hazard Control Manager, and holds a Certificate in Safety Management from the American Society of Safety Engineers and has completed their more advanced Executive Program in Safety Management. He has testified in over 100 trials in 28 states, Canada and Australia.

From 1974 to 1981, Mr. Kitzes worked at the U.S. Consumer Product Safety Commission (CPSC). For 3 years, he served as Legal Advisor to the Director, Office of Product Defect Identification, and was responsible for identifying product defects, implementing recalls and developing voluntary corrective action plans under Section 15 of the Consumer Product Safety Act.

As CPSC Program Manager for Sports, Recreation and Power Equipment (1977-1980), Mr. Kitzes was certified by the U. S. Government's Safety Management / Engineering Series (GS-018/803). He supervised a team of engineers, epidemiologists, human factors specialists, and technical communication staff in the evaluation of injury statistics, engineering data, and product use information to achieve a reduction in consumer products injuries. Injury prevention tools combined mandatory and voluntary standards, on-product warnings, and safety education campaigns; resulting in publication of the Federal Safety Standard for Walk-Behind Power Lawn Mowers 16 CFR 1205 (1979). Mr. Kitzes served as Commission representative to various industry groups and standards development committees, including American National Standards Institute (ANSI), American Society for Testing & Materials (ASTM), the Outdoor Power Equipment Institute and the Sporting Goods Manufacturers Association.

Mr. Kitzes has been retained as a consultant for a number of major manufacturers, including the Toro Company on product safety issues, the Vendo Company for developing warning labels and safety bulletins, the Jensen Corporation for safe operation of industrial equipment, Nobel Chemical Co. for adequacy of warnings and Corning Glass for evaluation of recalls, BernzOmatic, a division of the Newell Group, for development of point-of-purchase recall displays and advertising, Arctic Cat, Inc. for

17

analysis of all-terrain vehicle off-road safety, including instructions, warnings and foreseeable use, and Visioneer, Inc. in developing a program to upgrade computer scanners. He has developed a program for Global Industries to improve executive chair stability, reviewed warnings on heavy equipment for Daewoo Heavy Industries America, investigated safety issues for Carson Industries, Inc. and assisted CISCO Systems in recall development. Bill has designed a warning label for Whisper Communications, Inc., and assisted Wham-O, Inc. in recall procedures. He has provided risk analysis, recall assistance and consumer warnings and instructions to Restoration Hardware, Inc. and has developed warnings for Plastics Research Corp. concerning use of decorative building materials as protective barriers. He has reviewed advertising and promotional material for ACH Foods and assisted Hilton Hotels on recall issues. Bill has advised Swimways Corporation on product safety management and warnings.

Mr. Kitzes has served as an advisor to the National Association of Attorneys General, the State of New York. He is the former Chairman of the Florida Consumers' Council (1993-2007). He is the author of numerous articles in professional journals, including: *Standards, Regulations and Safety Guidelines to Protect Children from Injury,* Children and Injuries, 2001; *Risk Analysis in Product Liability Litigation,* 2000 Wiley Expert Witness Update; *Protecting Our Kids - Everyone Plays a Part,* Forum, Consumer Attorneys of California, December 1997; *Forensic Safety Analysis: Investigation and Evaluation,* 1996 Wiley Expert Witness Update; *The Role of the Safety Analyst in Product Liability Litigation,* Trial Diplomacy Journal, March/April 1995; *Safety Management and the Consumer Product Safety Commission,* Professional Safety, American Society of Safety Engineers, April 1991; and *ATVs -- The Hidden Danger,* Journal of Law, Medicine & Health Care, Spring 1989.

Mr. Kitzes has been an active speaker at the *National Safety Council* and the *International Consumer Product Health and Safety Organization.* He wrote a column on product safety for *CCH Consumer Product Safety Guide,* 2000-2001.

See attached Curriculum Vitae for additional information. Compensation for research and analysis is $1950 per 8 hour day. Fees for deposition and trial are $2950 per day.

# Consumer Safety Associates, LLC

4501 N.W. 25th Way
Boca Raton, Florida  33434

(561)  241-1900

Wm. F. Kitzes, J.D.
Board Certified
Product Safety Manager

———

Safety Analysis
Warnings
Expert Testimony

Safety Management
www.productsafety .com
kitzes@productsafety.com

———

FAX:
(561) 241-1903

## CURRICULUM VITAE

## William F. Kitzes

### Education

University of Wisconsin, B.A.; 1972
Washington College of Law, American University, J.D.; 1975
Certificate in Safety Management (1989)
    American Society of Safety Engineers
University of Michigan, College of Engineering,
    Human Factors Engineering, Summer 1990
Executive Program in Safety Management (2007)
    American Society of Safety Engineers

### Professional Safety Associations

National Safety Council • American Society of Safety Engineers
Board of Certified Product Safety Management, Executive Level
Board of Certified Hazard Control Management, Master Level
Human Factors Society • System Safety Society
International Consumer Product Health and Safety Organization
Florida Propane Gas Safety, Education and Research Council
Chairman, Florida Consumers' Council  (1993-2007)

### Work Experience

#### U.S. Consumer Product Safety Commission
#### Washington, D.C.  20207

#### 1975-1981

| | |
|---|---|
| 1975 - 1977 | Legal Advisor to the Director, Section 15<br>Office of Product Defect Identification |
| 1977 - 1980 | Program Manager<br>Sports, Recreation & Power Equipment<br>Office of the Executive Director |

1980 - 1981          Regulatory Counsel
                     Office of the General Counsel

The Institute for Safety Analysis, Inc.
Rockville, Maryland 20850

1981 - 1983
Vice President and General Manager

Consumer Safety Associates

1983 - Present
Safety Analyst, Product Safety Manager

Professional Experience

Mr. Kitzes has extensive experience in safety analysis, regulatory development,
and management systems. His background includes the following activities:

o   Managed and supervised professional staff of 18
    in preparing safety engineering analysis for
    nationally-known technical consulting firm which
    specialized in evaluating the safety performance
    of automotive and consumer products

o   Developed the Federal Safety Standard for Power
    Lawn Mowers, 16 CFR 1205; February 1979

o   Developed programs to identify and analyze safety
    performance data to evaluate compliance with the
    reporting requirements of Section 15 of the
    Consumer Product Safety Act

o   Negotiated voluntary corrective action programs
    and consent agreements with major manufacturers
    to recall defective products

o   Managed interdisciplinary task force of engineers,
    epidemiologists, attorneys, and investigators in
    developing standards and communications programs
    for sports, recreation, and power equipment

    o    Conducted special studies of nationwide injury
            patterns using the National Electronic Injury
            Surveillance System (NEISS)

    o    CPSC Awards include the
            Silver Medal for Meritorious Service, 1977 and the
            Superior Achievement Award, 1979

## Seminars and Workshops

Mr. Kitzes is an active speaker, author, and educator on safety-related issues. The following is a partial list of seminars, workshops, and lectures given by Mr. Kitzes since 1975:

<u>Compliance Issues and The Consumer Product Safety Act</u>, Diebold Research Group, 245 Park Avenue, New York, 1975

<u>Government Action Under the Consumer Product Safety Act</u> with Professor Robert Vaughn, Washington college of Law, American Bar Association, Washington, D.C., 1975

<u>Consumer Safety Officer Training</u> in accident analysis and implementing the provisions of Section 15 of the Consumer Product Safety Act (CPSA), U.S. Consumer Product Safety Commission, New York, Chicago, Minneapolis, and San Francisco, 1975 and 1976

<u>Manufacturers Compliance Seminar</u> on safety analysis and accident investigation for Sections 15 and 19 of the Consumer Product Safety Act (CPSA), U.S. Consumer Product Safety Commission, Kansas City, Missouri

<u>Marketing Analysis and Government Action</u>, panel with Dr. Salvatore Davita, George Washington University, Washington, D.C. 1976

<u>Reporting Requirements and Corrective Action Plans Under Section 15 of the CPSA</u>, Product Safety Conference, Washington, D.C., 1976

<u>Implementing the New Requirements for Notification and Reporting: 16 CFR 1115</u>, Product Safety Conference, Washington, D.C. 1977

<u>Changes in the Proposed Standard for Power Lawn Mowers</u>, Outdoor Power Equipment Institute, Washington, D.C. 1978

<u>The Federal Regulatory Process</u>, National Institute for Paralegal Training, Philadelphia, Pennsylvania, 1978 & 1979

The Art of Applying Technology in Personal Injury Lawsuits,
Regulatory Data -- A Buried Treasure, National Center for Technology
in Law, Hunt Valley, Maryland, 1981

The Human Factor: a safety/needs analysis of the modern fire fighting
environment, with Richard L.P. Custer, Foundation for Fire Safety, Cliffside
Manor, Harpers Ferry, West Virginia, 1981

CPSC and ATVs, AIEG, October 1986, and May 1987

ATV Safety, National Association of Attorneys General, October, 1987

Safety Analysis and the CPSA, American Pleasure Boat Safety Association,
January, 1988 and 1989

Safety Management and the CPSC, James Tuck Memorial Lecture, Keynote
Address, Detroit, Michigan, June 1990

Safety Analysis and Product Safety Management, Texas Trial Lawyers Product
Liability Seminar, Houston, Texas, April 1994

Safety Management and the Consumer Product Safety Commission, The
Academy of Florida Trial Lawyers, Orlando, Florida, January 1995

Panel on Child Safety, International Consumer Product Health and Safety
Organization, Orlando, Florida, March 1995

Recalls, Defects and Public Disclosure: Panel Discussion, International Consumer
Product Health and Safety Organization, Orlando, Florida, March 1996

National Safety Council Congress and Exposition, Session #51
Post Sale Corrective Action Plans - Recalls and Consumer Notice, Educational
Resources Division, Orlando, Florida, October 1996

National Safety Council Congress and Exposition, Session #152
Injury Prevention Analysis: Guidelines for Product Safety Managers, Educational
Resources Division, Chicago, Illinois, October 1997

Worldwide Juvenile Product Safety Panel, International Consumer Product Health
and Safety Organization, Orlando, Florida, February 1998

The Faces of the Future Seminar, Keenan's Kids Foundation, Atlanta, Georgia,
May 1998

The Role of the Safety Analyst, Kentucky Academy of Trial Attorneys, Louisville,
Kentucky, May 1998

National Safety Council Congress and Exposition, Session #69
When Risk Can't Be Eliminated:  Building Adequate Warnings, Educational
Resources Division, Los Angeles, California, October 1998

Freedom of Information, CPSC-ABA Forum, International Consumer Product
Health and Safety Organization, Orlando, Florida, February 1999

Protecting Our Kids, Faces of the Future Seminar, Keenan's Kids Foundation,
Atlanta, Georgia, March 1999

CPSC Compliance Workshop, Preparing, Developing and Implementing a
Successful Recall Program, Los Angeles, California, October 1999

CPSC Compliance Workshop, Conducting a Recall - Fast Track vs. Traditional,
International Consumer Product Health and Safety Organization, Orlando, Florida,
February 2000

CPSC Compliance Workshop, Designing, Producing and Distributing Safer
Consumer Products, International Consumer Product Health and Safety
Organization, Orlando, Florida, February 2001

Ten Principles of Product Safety Management,  Kentucky Academy of Trial
Attorneys, Louisville, Kentucky, May 2001

CPSC Compliance Course, Recall Success Stories, International Consumer
Product Health and Safety Organization, Orlando, Florida, February 2002

Masters in Trial, American Board of Trial Advocates, Chicago, Illinois,
June 2002

CPSC Compliance Course, CPSC and ICPHSO -- 10 Years Later, International
Consumer Product Health and Safety Organization, Orlando, Florida,
February 2003

CPSC Compliance Course, Section 15 Reporting Obligations, Panel, International
Consumer Product Health and Safety Organization, Orlando, Florida,
March 2004

Creating Safe Products--Practical Applications of Hazard Assessment,
International Consumer Product Health and Safety Organization, Orlando, Florida,
February 2005

Warnings and Instructions, Human Factors Symposium, ICPHSO and CPSC,
International Consumer Product Health and Safety Organization, Bethesda,
Maryland, September 2005

Introduction to Product Safety, AIG UK Limited, Human Focus, Web based video Instruction Programme, Accredited by the Royal Society for the Prevention of Accidents, London, England, United Kingdom, 2007
Risk Assessment, AIG Consultant, Inc., New York, 2008

Risk Management 101, ICPHSO and CPSC Compliance and Training Seminar, International Consumer Product Health and Safety Organization, Chicago, Illinois, May 2008

## Publications

Standards, Regulations and Safety Guidelines to Protect Children from Injury, Children and Injuries, Joe Frost, ed., Lawyers & Judges Publishing Company, Inc., Tucson, Arizona, 2001

Columnist, Product Safety:  An In-Depth Analysis, Consumer Product Safety Guide, CCH, Chicago, Illinois, 2000 - 2001

Risk Analysis in Product Liability Litigation, 2000 Wiley Expert Witness Update, New Developments in Personal Injury Litigation, Aspen Law & Business, New York, 2000

Protecting Our Kids - Everyone Plays a Part, Forum, Consumer Attorneys of California , Volume 27, No. 10, December 1997

Forensic Safety Analysis:  Investigation and Evaluation, 1996 Wiley Expert Witness Update, New Developments in Personal Injury Litigation, John Wiley & Sons, Inc., New York, 1996

The Role of the Safety Analyst in Product Liability Litigation, Trial Diplomacy Journal, Vol. 18, No. 2, March/April 1995

Safety Management and the Consumer Product Safety Commission, Professional Safety, Vol. 36, No. 4, April 1991

ATVs – The Hidden Danger, Journal of Law, Medicine and Health Care, Vol. 17, No. 1, Spring, 1989

Private Causes of Action Under the Consumer Product Safety Act, Trial Lawyers Quarterly, Vol. 17, No. 1, 1985

Administrative Civil Penalties Are Here To Stay, But How Should They Be Implemented?  Wm. F. Kitzes and David Schmeltzer, American University Law Review, Vol. 26, No. 4, Washington, D.C., 1977

Substantial Hazards in Consumer Products, (Investigators Manual), Wm. F. Kitzes, U.S. Consumer Product Safety Commission, 1977

Depositions / Trials--Wm. F. Kitzes

The list of deposition testimony below includes cases since May of 2005.
I have done my best to assemble a reasonably complete list. I cannot state with certainty
that the list includes every deposition I have given, but I believe it includes the substantial
majority. Cases that include both deposition and trial testimony are indicated with a
(D & T). Trial testimony not preceded by deposition in the last four years appears at the
end of this list.

| 4/09 | Peter Kaufman<br>Pensacola, FL | Donnelly v. Medline Industries, Inc. |
|---|---|---|
| 4/09 | David Lira<br>Los Angeles, CA | Kalinyuk v. Costco Wholesale |
| 4/09 | Matthew Biegert<br>New Richmond, WI | Coulter v. Victory Fireworks |
| 4/09 | Edward Willer<br>Chicago, IL | Calles v. Scripto Tokai |
| 2/09 | Rick Alvis<br>Birmingham, AL | Wallace v. Rheem |
| 1/09 | Barry Rooth<br>Merrillville, IN | Wright v. Cutting Edge Creations |
| 10/08 | David Huber<br>Chicago, IL | Carreno v. Ledraplastic SPA |
| 10/08 | Doug Morris<br>Prospect, KY | Fiveash v. Honda |
| 9/08 | Stuart Singer<br>Fort Lauderdale, FL | Eccles v. Bosch, Kent v. Bosch,<br>Trombly v. Bosch |
| 9/08 | Michael Dettmer<br>Traverse City, MI | Grozenski v. Munson Medical Center |
| 8/08 | Terrence Smith<br>Teaneck, NJ | Rivers v. Galler, et al. |
| 7/08 | Nicholas Blanda<br>Lafayette, LA | Thomas v. Razor Sharp Edgemaking |
| 6/08 | James Gilman<br>Albuquerque, NM | Locklear v. KMart |

| | | |
|---|---|---|
| 5/08 | Carlos Silva<br>Miami, FL | Napier v. Hunter Douglas |
| 5/08 | Joe Bednarz<br>Nashville, TN | Lee v. Taser |
| 5/08 | Dane Wood<br>Phoenix, AZ | Marroquin v. Caterpillar |
| 4/08 | Wendell Walsh<br>Mishawaka, IN | Barton v. All American Homes |
| 2/08 | Jay Howanitz<br>Jacksonville, FL | Mayhugh v. Stein Mart |
| 1/08 | John Little<br>Jackson, TN | Graco v. Shelter Insurance |
| 12/07 | Marlene Wahlstrom<br>Wausau, WI | Weckesser v. Honson Marketing |
| 10/07 | Antonio Ponvert, III<br>Bridgeport, CT | Hill v. US Smokeless Tobacco |
| 10/07 | JR Hullverson<br>St. Louis, MO | Fiedler v. Chrysler  (D & T) |
| 9/07 | Kirk Wolden<br>Sacramento, CA | Sanchez v. WalMart and Dorel |
| 8/07 | Barry Russell<br>Des Moines, IA | Calcaterra v. Q.E.P. |
| 8/07 | Ashley Ogden<br>Jackson, MS | Dear et al. v. Honda |
| 7/07 | Matthew Tanner<br>Chicago, IL | Shinneman v. Walgreens |
| 5/07 | Stephen Echsner<br>Pensacola, FL | Avent v. Phoenix V |
| 4/07 | Marc Ginsberg<br>Miami, FL | Ramirez v. Bajer Design and Marketing |
| 2/07 | Clark Batten<br>Lexington, KY | Blakeman v. Electrolux Home Products<br>(D & T) |

| | | |
|---|---|---|
| 2/07 | Richard Rice<br>Kansas City, MO | Whittaker v. Brass Eagle |
| 11/06 | Joe Bednarz<br>Nashville, TN | Shotts v. Bombardier  (D & T) |
| 11/06 | Briggs Smith<br>Batesville, MS | Stephens v. LaJobi Industries, Inc. |
| 9/06 | Justin Johnson<br>St. Petersburg, FL | Zunner v. Florida Pool Products and WalMart<br>(D & T) |
| 9/06 | Carl Grayson<br>Edgewood, KY | Goff v. Daisy  (D & T) |
| 8/06 | Chris Vlachos<br>Pensacola, FL | Romans v. Sears |
| 8/06 | William Rankin<br>Pensacola, FL | Davidson v. Sears |
| 7/06 | Stephen Echsner<br>Pensacola, FL | Collins v. Dollar Tree Stores, Inc., and<br>Dollar Tree Distribution, Inc. |
| 7/06 | Darrell Scott<br>Spokane, WA | Nemri v. Martha Stewart Living Omnimedia<br>Inc. and KMart Corporation |
| 7/06 | Adrian Soud<br>Jacksonville, FL | Gottshall v. Kasam Hospitality |
| 7/06 | Stan Koop<br>Oklahoma City, OK | Kirtley v. DeLonghi |
| 6/06 | Gary Gober<br>Nashville, TN | Spicer v. The Brinkmann Company |
| 5/06 | Steve Browning<br>Jacksonville, FL | Fitz v. Mau |
| 4/06 | Terrence McCartney<br>New York, NY | Malo v. Weissner et al. |
| 3/06 | Tom Guelzow<br>Eau Claire, WI | Schnack v. Carter Brothers |
| 3/06 | Paul D'Amato<br>Linwood, NJ | Masterson v. B.J. Stores  (D & T) |
| 2/06 | Tom Conway<br>Louisville, KY | Linker v. Nikota USA and Pep Boys |

| 12/05 | John Merritt<br>Little Rock, AR | Dorr v. Yamaha |
| 11/05 | Mike Kelly<br>Columbia, SC | Stafford v. Daisy |
| 11/05 | Robert Baker<br>Ft. Lauderdale, FL | Roberts v. Bombardier  (D & T) |
| 10/05 | Robert Baker<br>Ft. Lauderdale, FL | Parlato v. Shindaiwa  (D & T) |
| 10/05 | John Gaebe<br>Miami, FL | Landrin v. MGA Entertainment |
| 8/05 | Ed Matonich<br>Hibbing, MN | Sushoreba v. Easy Heat |
| 7/05 | Ralph Chapman<br>Clarksdale, MS | Smith v. Paccar |
| 6/05 | Robert Baker<br>Boca Raton, FL | Dalal v. Ryder |
| 6/05 | Clark Shanahan<br>Owosso, MI | Swix v. Daisy |
| 5/05 | Stewart Greenberg<br>Miami, FL | Martinez v. Commercial Jet |
| 5/05 | Michael Di Croce<br>Indian Mills, NJ | Alcott v. Polaris |

10/05     Ogozaly v. Honda, State Court, Pennsylvania, Judge Fine (T)

4/06     Lopez v. Kawasaki, State Court, Middlesex County, New Jersey (T)

# Consumer Safety Associates, LLC

4501 N.W. 25th Way
Boca Raton, Florida  33434

(561)  241-1900

**Wm. F. Kitzes, J.D.**
Board Certified
Product Safety Manager
———

Safety Analysis
Warnings
Expert Testimony

Safety Management
www.productsafety.com
kitzes@productsafety.com
———

FAX:
(561) 241-1903

Fee Schedule

Compensation for research, analysis and travel (pro-rated) is $1950 per 8 hour day
Fees for deposition and trial are $2950 per day
Plus Expenses

Washington D.C. Research Services
CPSC  •  NHTSA  •  OSHA  •  FDA