**E-Filed 11/20/09**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EVELYN ROSA and ROBERT ROSA, individually and as the personal representatives of MICHAEL ROBERT ROSA, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SEASIDE et al.,<br><br>Defendants. | Case Number C 05-03577 JF<br><br>ORDER[1] GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>Re Docket No. 211 |

Plaintiffs Evelyn and Robert Rosa ("Plaintiffs") brought the instant action pursuant to 42 U.S.C. § 1983, California Civil Code § 52.1 et seq., and California tort law on behalf of themselves and their deceased son, Michael Rosa. All claims have been dismissed except for Plaintiffs' tort claims against Defendant TASER International, Inc. ("TASER"). Plaintiffs allege that a TASER-manufactured Electronic Control Device ("ECD") was a substantial contributing factor in their son's death and that TASER either is strictly liable for or was negligent in failing to warn of the danger posed by its product. Discovery is complete, and the matter is set for trial.

---

[1] This disposition is not designated for publication in the official reports.

TASER moves for summary judgment as to the claims asserted against it. For the reasons discussed below, the motion will be granted.[2]

# I. BACKGROUND

A.  Factual Background

   1.     August 29, 2004

Michael Rosa ("Rosa") lived with Plaintiffs, his parents, in Del Ray Oaks, California. At approximately 11:00 P.M. on August 29, 2004, one of Plaintiffs' neighbors called the police to report a disturbance in the area. The neighbor told the police dispatcher that "somebody [was] walking up and down the street yelling 'Mario' and yelling some other stuff" and that the person "looks like he's pretty disturbed, he's been out here probably fifteen minutes yelling." (Cecilio 911 Tr. 1-2.) The person in question was Rosa; and "Mario" is Del Ray Oaks Police Sergeant Mario Villareal, with whom Rosa had developed a friendship.

Several minutes after the neighbor's call, Del Ray Oaks Police Officer Russell Van Zanten ("Van Zanten") arrived on the scene. According to Van Zanten, Rosa had a "crazed look" on his face, was shaking his hands up to his mouth, and was walking erratically down the street. Based on these observations, Van Zanten concluded that Rosa was "either really high or crazy" and reported to dispatch that Rosa was "5150," meaning that he appeared to be suffering from mental illness or other psychological disturbance. (Van Zanten Dep. 19, 22.) As Van Zanten tried to talk to Rosa, Rosa slapped Van Zanten's patrol car and yelled, "No, no, you're not the police!" (*Id.* at 21-23; District Attorney Report 3.)

As additional law enforcement officers arrived, Rosa continued to behave erratically and to attempt to evade the officers. Rosa grabbed a fence between two houses and kicked through it as the officers followed him and commanded him to stop. When Seaside Police Officer Matthew Doza ("Doza") confronted Rosa outside a house on Plaintiffs' street, Rosa hopped a fence behind the house. On the other side of the fence was a steep grade, which Rosa and the officers

---

[2]TASER also has filed twenty-six motions *in limine*. These motions will be terminated as moot in light of the disposition of the motion for summary judgment.

2

following him crossed. At one point, Rosa picked up a two-by-four and held it in "almost like a batter's stance" as if he were going to strike one of the officers. (Doza Dep. 76: 5-9.) Doza fired his ADVANCED TASER M26 ECD at Rosa. Doza reported his deployment of the ECD to the dispatcher at 11:14:22 P.M. (Dispatch History Incident Detail 1.) After being struck by the wires from Doza's ECD, Rosa tumbled down the embankment on which he had been standing, breaking contact with the ECD's wires. Doza replaced the cartridge in his ECD, followed Rosa down the embankment, and fired his ECD again while Rosa was on all fours. Van Zanten approached Rosa and kicked the two-by-four out of Rosa's reach. Doza pulled the trigger several times to "keep [Rosa] from standing up," though Doza did not feel that the ECD was "a hundred percent effective." (Doza Dep. 97: 16-18.)

As Doza applied his ECD to Rosa at the bottom of the embankment, Seaside Police Officer Nick Borges ("Borges") arrived and applied his ECD to Rosa as well. After Borges's ECD had cycled three times, other officers attempted to restrain Rosa. Rosa continued to resist the officers' efforts, at which point one of the officers used the "drive-stun" mode (described below) to apply his ECD to Rosa's leg. Though Rosa continued to kick and move, the officers were able to hold him down on his stomach long enough to place handcuffs on him. Several officers have testified that Rosa continued to resist while being handcuffed. At 11:15:17 P.M., Doza reported to the dispatcher that Rosa was in custody, meaning that the handcuffs were in place. Rosa then was rolled over on his side. At this point, officers observed that Rosa was sitting up "slumped over" and was unresponsive. (Van Zanten Dep. 59-61.) The officers noted that Rosa was breathing shallowly and his eyes were looking around rapidly, and then that he was not breathing at all. After Van Zanten checked Rosa's carotid artery and found no pulse, the officers attempted CPR and called for medical assistance. Rosa was taken to Community Hospital of Monterey Peninsula, where he was pronounced dead at approximately 12:30 A.M. on August 30, 2004.

### 2.  ADVANCED TASER M26 Electronic Control Devices (ECDs)

#### a.  Generally

TASER ECDs are used by more than 12,000 law enforcement agencies in the United

3

States and in forty-four countries. The ECDs are designed to allow officers to protect themselves while reducing the risk of serious injury or death. The M26 model is powered by a battery of eight AA penlight cells and works by "transmitting stimuli through brief, low-charge, short duration electrical pulses." (Patrick Smith Decl. ¶ 12.)

The M26 may be applied in one of two ways. In the first, known as "probe application," two probes fired by compressed nitrogen and electrical impulses are transmitted into the target through thin wires. In probe mode, the electrical impulses block the command and control center of the body at the motor-neuron level, causing skeletal muscles to contract and causing the target to become temporarily incapacitated. When a successful circuit is created, and completed, 9,700 volts of energy are delivered to the target's body for five seconds. In the second application, known as the "drive-stun" mode, the ECD is physically pressed against the target and electrical impulses are transmitted superficially through electrodes on the ECD. In this mode, the ECD works through "pain compliance" rather than muscle contraction. The ECDs also are equipped with memory chips or "dataports" that record each particular ECD's transmissions.

TASER has developed a comprehensive warning system in which every ECD sold or distributed is accompanied by a training CD/DVD and operating manual to be used by TASER-certified instructors. TASER provides updates of any and all safety materials, information, and training programs to its instructors. Instructors are required to keep up-to-date to retain their certification.

    **b.  The ECDs Applied to Rosa**

TASER shipped the ECDs used by Borges and Doza to its distributor, ALD Company, Inc., on December 30, 2003, with the then-current operating manual. Borges received ECD training in January 2003, and Doza received ECD training in July 2004. Prior to August 29, 2004, the Seaside Police Department had received the M26 operating manual and the most recently issued training CD/DVD. These materials included the following warning:

> The ADVANCED TASER is a less-lethal weapon. It is designed to incapacitate a target from a safe distance without causing death or permanent injury. While the medical evidence strongly supports the ADVANCED TASER will not cause lasting after effects or fatality, it is important to remember the very nature of physical confrontation involves a degree of risk that someone will get hurt or may

> even be killed due to unforeseen circumstances and individual susceptibilities. Accordingly, the ADVANCED TASER should be treated as a serious weapon and should only be deployed in situations where the alternative would be to use other force measures which carry similar or higher degrees of risk.

TASER M26 Operating Manual 2; TASER Lesson Plan iv. The training materials and lesson plans include other similar language.

According to the memory chips in the ECDs used by Doza and Borges on August 29, 2004, Doza's ECD cycled seven times at the bottom of the embankment, and Borges's unit cycled three times. Assuming that each trigger pull completed a five-second cycle, which cannot be known with certainty, Rosa received fifty seconds of electrical current, not including the initial current from Doza's ECD at the top of the embankment or the drive-stun application by another officer just prior to Rosa's being handcuffed.

### 3. Autopsy and Toxicology Report

Following Rosa's death, Rosa's body was subjected to a toxicology report and an autopsy. The toxicology report found a "high level of d-methamphetamine (1.73 milligrams per liter) . . . and low level of d-amphetamine (0.15 mg/L) [that] are consistent with recent administration of methamphetamine." (Hain Autopsy Rep. 5.) Dr. John Hain ("Hain"), a medical examiner for the County of Monterey, performed an autopsy on Rosa and concluded that the cause of death was "ventricular arrhythmia (minutes), due to methamphetamine intoxication," and that "the added stress and/or physiologic effects of TASER application and arrest by police very likely contributed to death." (*Id.* at 5.) Hain also reported that Rosa's heart exhibited "moderate enlargement." (*Id.* at 3.)

## B. Procedural Background

Plaintiffs filed the instant complaint on September 6, 2005, against TASER and numerous governmental entities and individual law enforcement officers. Over the intervening four years, Plaintiffs have stipulated to the dismissal of their claims against all Defendants except TASER. On September 25, 2009, TASER filed the instant motion for summary judgment, along with six motions *in limine*. These motions, as well as twenty additional motions *in limine*, came before the Court on November 13, 2009.

## II. LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that might affect the outcome of the case under the governing law. *Id.* at 248. There is a genuine dispute about a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The moving party bears the initial burden of informing the Court of the basis for the motion and identifying portions of the pleadings, depositions, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the party moving for summary judgment would not bear the ultimate burden of persuasion at trial, it must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its initial burden, the burden shifts to the nonmoving party to present specific facts showing that there is a genuine issue of material fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

The evidence and all reasonable inferences must be viewed in the light most favorable to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). Summary judgment thus is not appropriate if the nonmoving party presents evidence from which a reasonable jury could resolve the material issue in its favor. *Liberty Lobby*, 477 U.S. at 248-49; *Barlow v. Ground*, 943 F.2d 1132, 1134-36 (9th Cir. 1991).

## III. DISCUSSION

Plaintiffs claim that TASER is liable under both strict liability and negligence theories because it failed to warn Doza and Borges that extended ECD application could lead to acidosis-induced cardiac arrest. Under California law, a defendant manufacturer, supplier, or merchant can be held strictly liable for a failure to warn only if a plaintiff proves that:

(1) the defendant manufactured, distributed, or sold the product; (2) the product

6

    had potential risks that were known or knowable at the time of manufacture or distribution, or sale; (3) that the potential risks presented a substantial danger to users of the product; (4) that ordinary consumers would not have recognized the potential risks; (5) that the defendant failed to adequately warn of the potential risks; (6) that the plaintiff was harmed while using the product in a reasonably foreseeable way; (7) and that the lack of sufficient warnings was a substantial factor in causing the plaintiff's harm.

Jud. Council of Cal. Civ. Jury Instruction No. 1205. Similarly, to succeed on a claim of negligent failure to warn under California law, a plaintiff must prove that:

    (1) the defendant manufactured, distributed, or sold the product; (2) the defendant knew or reasonably should have known that the product was dangerous or was likely to be dangerous when used in a reasonably foreseeable manner; (3) the defendant knew or reasonably should have known that users would not realize the danger; (4) the defendant failed to adequately warn of the danger or instruct on the safe use of the product; (5) a reasonable manufacturer, distributor, or seller under the same or similar circumstances would have warned of the danger or instructed on the safe use of the product; (6) the plaintiff was harmed; and (7) the defendant's failure to warn or instruct was a substantial factor in causing the plaintiff's harm.

Jud. Council of Cal. Civ. Jury Instruction No. 1222.

    TASER seeks summary judgment as to both of these theories. It asserts that there are no genuine issues of material fact with regard to whether: 1) the alleged propensity of ECDs to cause metabolic acidosis was known or knowable on December 30, 2003, when the ECDs in question were shipped from TASER to its distributor; 2) TASER's warnings with respect to the dangers posed by application of its ECDs were adequate; and 3) there was a causal connection between the application of TASER's ECDs and Michael Rosa's death. Because it concludes that the first two points are well-taken, the Court does not reach the issue of causation or the numerous motions *in limine* related to that issue.

**A.    Strict Liability: Known or Knowable Dangers**

    Under California law, "[t]he rules of strict liability require a plaintiff to prove only that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution." *Anderson v. Owens-Corning Fiberglass Corp.*, 53 Cal. 3d 987, 1002 (Cal. 1991); *see also Conley v. R.J. Reynolds Tobacco Co.*, 286 F. Supp. 2d 1097, 1111-12 (N.D. Cal. 2002) (citing and applying *Anderson*'s "known or knowable" standard). Plaintiffs' theory of causation posits that the officers' applications of TASER's ECDs to Rosa

caused or exacerbated metabolic acidosis in a way that contributed substantially to Rosa's cardiac arrest. TASER contends that it was not generally recognized in the scientific community in 2003–nor has it been established since–that there was a risk of metabolic acidosis in humans from the application of ECDs.

Plaintiffs' sole evidence on this point consists of two publications dated prior to December 2003. One is a report prepared for the United States Department of Justice in 1999 by a number of researchers including Dr. Raymond Fish, a defense expert in this action. The researchers, who published the report collectively as the Human Effects Advisory Panel ("HEAP"), reported on tests of an earlier ECD–not manufactured by TASER–called the "Sticky Shocker." Plaintiffs rely on the following excerpts from the report:

> Those who did die after Taser use may have done so because of indirect cardiac effects involving acidosis. . . .
>
> Most deaths following the use of Tasers have involved persons taking PCP or cocaine. PCP and cocaine can lead to fatal arrhythmias or cardiac failure, especially in the presence of acidosis. Dysrhythmias (abnormal heart rhythms) will occur with lower drug levels in the presence of acidosis. Persons who are taking these drugs and are agitated enough to require police action are usually acidotic – their blood pH is lower than normal. Increased muscular activity and decreased breathing increases acidosis and increases the likelihood of fatal dysrhythmias and cardiac failure.
>
> Therefore, <u>deaths following Taser use may be due to acidosis</u>. Acidosis may have caused cardiac dysrhythmias or failure in the presence of illicit drugs that are usually present in persons being Tasered. Deaths following Taser use may be related to the ability of these devices to cause increased muscle activity and decreased breathing. Persons being Tasered are usually agitated and hyperactive.

John M. Kenny et al., *Human Effects Advisory Panel, Report of Findings: Sticky Shocker Assessment* 31 (July 29, 1999) (hereinafter "HEAP Report") (emphasis in original); (Pls.' Opp. to Def.'s Mot. for Summ. J ("MSJ") 7-8.).

There are several problems with Plaintiffs' reliance on this report–generally and on the quoted language in particular. Most obviously, the language is the scientific equivalent of dicta: the focus of the panel's actual research was the "Sticky Shocker" and not a TASER product. HEAP report at 4 ("The Human Effects Advisory Panel was asked to address six questions regarding the Sticky Shocker's human effects."). While the panel did compare the Sticky Shocker with TASER products then in use, it acknowledged explicitly that "there was no

scientific proof" of the claim that the two products' electrical effects on the human body were the same. *Id.* at 28.

Other observations in the report also expressly limit the inferences that reasonably might be drawn from the excerpts cited by Plaintiffs. For example, in summarizing the study's findings, the panel wrote that electrical insult from the Sticky Shocker "could cause acidosis, which can lead to death. *The probability of this occurring is unknown*." HEAP Report at 7 (emphasis added). Similarly, the first sentence quoted by Plaintiffs appears in the context of the following two paragraphs:

> As previously mentioned, there is currently not enough relevant heart current data available to predict the Sticky Shocker's cardiac effect. **The Taser lacks relevant heart data as well**. But based on a few clinical (Ordog, 1987) and law-enforcement (Kornblum and Reddy, 1991) observations, **the Taser has appeared effectively innocuous to its majority of subjects**.
>
> *Those who did die after Taser use may have done so because of indirect cardiac effects involving acidosis.* These deaths usually have been delayed. Respiratory and cardiac arrest in the cases are reported in the medical literature 5 to 45 minutes after the stunning. Thus, **the deaths did not involve the immediate induction of ventricular fibrillation or other dysrhythmias by the Taser**.

HEAP Report at 31 (emphasis added; italics represent Plaintiffs' quoted language).

More importantly, as indicated in the footer that appeared on each page, the report was "a research report submitted to the U.S. Department of Justice," and it was not available in the public domain when it was produced in July 1999. TASER offers uncontroverted evidence that it had no knowledge of the study until the fourth quarter of 2004. (Patrick Smith Depo. 176: 3-16.) For their part, Plaintiffs offer no evidence that the findings of the report, such as they were, were "scientifically known or knowable" by TASER at the time TASER manufactured and distributed the ECDs used on Rosa.

Instead, Plaintiffs argue that Dr. Fish's subsequent commentary in *The Lancet*, a British medical journal, put TASER on notice of the acidosis risk posed by ECDs. Plaintiffs contend that in this second publication, which appeared in 2001 under the title, "Effects of Stun Guns and Tasers," Fish "reiterat[ed] his concerns about the risks of ECD-induced cardiac dysrhythmias resulting from metabolic acidosis." (Pls.' Opp. to Def.'s MSJ 9.) The language in *The Lancet*

commentary upon which Plaintiffs rely, in its entirety, is the following:

> Apart from, but probably related to, drug addiction, another feature that taser-injured people generally have in common is severe agitation plus physical aggression. Some of these people may have a metabolic acidosis. Acidosis may increase ventricular dysrhythmias, especially in the presence of phencyclidine and cocaine. The taser itself may affect acid-base balance by briefly increasing skeletal muscle activity and decreasing respiration.

Fish, Raymond M. & Geddes, Leslie A., "Effects of Stun Guns and Tasers," 358 *The Lancet* 687, 688 (September 1, 2001).

TASER argues persuasively that the two Fish publications merely hypothesize that ECD application *may* affect acid-base balances in humans, and do not establish in any scientific sense that in fact it does. TASER also argues that Fish's hypotheses assume the correctness of a mistaken underlying hypothesis: that ECD applications in humans would decrease respiration. "[T]he scientific community now knows, however, . . . that we humans continue to breathe during ECD applications and that many [humans] even increase respirations, a good thing from an acidosis standpoint." (Def.'s Reply in Supp. of MSJ 3 (citing Fish Expert Report).) In his expert report on behalf of TASER in this action, Fish "unequivocally rejects the theory that ECDs on humans decrease respirations and cause dangerous acidosis." (*Id.* at 3-4.)

Because they have offered no evidence that the 1999 HEAP report was publicly known or available prior to the shipment of the ECDs in question in 2003, or even prior to Rosa's death in 2004, Plaintiff's evidence as to whether the risks of metabolic acidosis associated with TASER's ECD were "known or knowable" amounts to one paragraph in one two-page commentary written by Fish, a defense expert in this action who repudiates the precise implications for which Plaintiffs cite that paragraph. As both parties acknowledge in their moving papers, California courts require that plaintiffs present evidence of "*general* recogni[tion] and *prevailing* best scientific and medical knowledge" to meet the "known or knowable" element of a strict liability claim. *Anderson*, 53 Cal. 3d at 1002 (emphasis added). There simply is no basis upon which a reasonable jury could conclude that the opinion reflected in Fish's statements in *The Lancet* regarding acidosis was either "generally recognized" or "prevailing" in the scientific and medical communities, let alone that it was both. TASER thus is entitled to summary judgment on

1  Plaintiffs' strict liability claim.

2  **B.     Negligence:  Reasonableness**

3  "Negligence law in a failure-to-warn case requires a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., *what a reasonably prudent manufacturer would have known* and warned about." *Anderson*, 53 Cal. 3d at 1002-03.  It is undisputed that TASER did not warn of risks of metabolic acidosis from ECD applications before December of 2003.  However, as discussed above, Plaintiffs have failed to provide evidence from which a reasonable jury could conclude that a reasonably prudent manufacturer would have issued such a warning.

As with their strict liability theory, Plaintiffs rely entirely on the two Fish publications to establish that TASER should have known of the risk of metabolic acidosis posed by ECD applications.[3]  For the same reason that this evidence is insufficient as a matter of law to raise a triable issue as to "knowability" of the risk, it also is insufficient to create a triable issue as to whether TASER *should have known* of the risk.  *See Valentine v. Baxter Healthcare Corp.*, 68 Cal. App. 4th 1467, 1483-84 (Cal. Ct. App. 1999) ("Under a negligence standard, a reasonable manufacturer would not be charged with knowing more than what would come to light from the prevailing scientific and medical knowledge.")  Given the undisputed evidence that the HEAP report was not in the public domain until after the events at issue in this case, Plaintiff's evidence again consists of one comment in a brief commentary offering a hypothesis, unaccompanied by any other evidence, before or after its publication, supporting or even repeating that hypothesis.  There is no legal authority for imposing a duty to warn based on evidence this sparse.  TASER thus is entitled to summary judgment on Plaintiffs' negligence claim as well.

//

---

[3] Plaintiffs appear to argue that the testimony of their proffered warnings expert, William Kitzes, creates a triable issue of fact as to negligence.  Kitzes's testimony about the warnings TASER should have given, however, is relevant only if TASER should have known about the risk of metabolic acidosis in December 2003.  As Kitzes is not qualified to opine as to this fact, but merely assumes it in forming his expert opinions with regard to warnings, his testimony cannot create a triable issue as to whether TASER should have known about the risk.

## IV. Conclusion

The Court is mindful both of the importance of this case to Plaintiffs and the significant expense incurred by both parties in preparing for trial. Because the instant motion was briefed and argued so late in the proceedings, the Court has been unable to consider the issues presented until now. Nonetheless, the Court is satisfied that the result is compelled by the law and the evidence in the record.

In their opposition papers, Plaintiffs frequently direct the Court's attention to another recent case against TASER in this district, *Heston v. City of Salinas*, C 05-03658 JW. In *Heston*, the jury found for TASER on the plaintiffs' strict liability claim, but it also found TASER fifteen percent responsible for the death of the plaintiffs' decedent on a negligence theory. Following the jury's verdict, TASER's renewed motion for judgment as a matter of law with regard to punitive damages was granted, while its motion for a new trial was denied. The judgment now is on appeal to the Ninth Circuit (USCA Case Number 09-15327).

The Court's order on the instant motion is not inconsistent with any of Judge Ware's rulings in *Heston*. While Judge Ware denied TASER's motion for summary judgment, TASER's motion in *Heston* did not challenge the sufficiency of the plaintiffs' evidence regarding the "known or knowable" or "should have known" elements of the plaintiffs' claims with respect to ECD-induced metabolic acidosis. Instead, TASER challenged only the plaintiffs' evidence as to causation. *See Heston*, C 05-3658 (Docket #122). While the Court will not speculate as to why TASER did not raise in *Heston* the issues addressed by the instant motion, the Court notes that the underlying incident in *Heston* occurred in 2005. It is not apparent when the ECDs at issue in *Heston* were manufactured and distributed, but it appears likely that the state of scientific and medical research in 2005 may have been different than it was at the time of the underlying incident in this case.

//
//
//
//

## V. Order

The motion for summary judgment is granted. Judgment will be entered accordingly.

**IT IS SO ORDERED.**

DATED: 11/20/09



JEREMY FOGEL
United States District Judge